# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**Constance M. Blessing,**
**Plaintiff Below, Petitioner**

**vs) No. 13-0953** (Kanawha County 13-C-398)

**The Supreme Court of Appeals of West Virginia,**
**Brent D. Benjamin in his capacity as Chief Justice,**
**The West Virginia State Bar, and Anita R. Casey**
**in her capacity as Executive Director,**
**Defendants Below, Respondents**

**FILED**
**May 27, 2014**
released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Constance M. Blessing, plaintiff below, appeals the Order Granting Defendants' Motion to Dismiss entered by the Circuit Court of Kanawha County on August 19, 2013. Respondents, the Supreme Court of Appeals of West Virginia, Justice Brent D. Benjamin in his former capacity as Chief Justice, the West Virginia State Bar, and Anita R. Casey in her capacity as Executive Director of the State Bar, defendants below, respond in support of the circuit court's order. Petitioner is represented by Richard A. Robb, while respondents are represented by Mark A. Atkinson, John J. Polak, and Paul Frampton Jr.[1]

Petitioner argues that it was error for the circuit court to dismiss her Amended Complaint pursuant to Rule 12(b)(6) of the West Virginia Rules of Civil Procedure. After carefully considering the parties' briefs, oral argument, and the record on appeal, we find no substantial question of law and no error. Accordingly, for the reasons set forth below, and in accordance with Rule 21 of the Rules of Appellate Procedure, we affirm the circuit court's order through this memorandum decision.

---

[1]Current Chief Justice Robin Jean Davis, along with Justices Brent D. Benjamin, Margaret L. Workman, and Menis E. Ketchum, who were justices of this Court during the time period of the events alleged in the petitioner's Amended Complaint, have voluntarily disqualified themselves from participation in this case. By administrative order entered on September 20, 2013, Acting Chief Justice Allen H. Loughry II assigned Circuit Court Judges John W. Hatcher Jr., James J. Rowe, Phil Jordan, and Lawrance S. Miller Jr. to this Court for purposes of consideration and decision in this appeal. None of the judicial officers who have participated in this appeal were involved with, or have personal knowledge of, any of the events alleged in the Amended Complaint.

1

## I. Factual Allegations and Procedural Background

Ms. Blessing asserts that she was employed by the West Virginia State Bar[2] for more than twenty-five years before she took early retirement at the age of sixty-two on February 28, 2011. She held the position of Executive Assistant and spent most of her employment working under the direction of former State Bar Executive Director Thomas R. Tinder. Ms. Casey replaced Mr. Tinder as the Executive Director in 2008.

On February 26, 2013, Ms. Blessing filed suit in circuit court against respondents, and she amended her complaint on February 28, 2013.[3] She alleges six common law counts with regard to her State Bar employment: (1) constructive discharge as the result of an intolerable working environment; (2) gender discrimination; (3) age discrimination; (4) forced resignation in violation of public policy; (5) invasion of privacy; and (6) intentional infliction of emotional distress.

Ms. Blessing's Amended Complaint contains several factual allegations in support of her argument that she was mistreated at work after Ms. Casey became the State Bar Executive Director. We presume that respondents would deny some or all of the allegations.[4] However, because this appeal is before us upon the circuit court's order granting a motion to dismiss, we treat the factual allegations in the Amended Complaint as true. *See* Syl. Pt. 1, *Wiggins v. Eastern Associated Coal Corp.*, 178 W.Va. 63, 357 S.E.2d 745 (1987) ("On appeal of a dismissal based on granting a motion pursuant to West Virginia Rules of Civil Procedure 12(b)(6), the allegations of the complaint must be taken as true.").

In the Amended Complaint, Ms. Blessing alleges that almost immediately upon becoming the Executive Director, Ms. Casey began criticizing how the State Bar was operated during the prior twenty years. Ms. Blessing alleges that Ms. Casey constantly belittled and disparaged her work performance and compensation, as well as that of three other State Bar employees, telling them they were "undereducated," "overpaid," and that almost everything they had done in the past was wrong. The Amended Complaint also asserts that Ms. Casey did not send flowers or other condolences after Ms. Blessing's husband and mother died; made Ms. Blessing wade through sewage when a sewer line broke in the office; forced her to reschedule her knee surgery three times; made her work from the hospital after her knee surgery, and then refused to credit her leave time for this work; did not allow her to take the day off after her husband died, even though she had sufficient accumulated leave time to do so; directed her to curtail her workplace conversations with State Bar members about their families and other

---

[2]The State Bar is an agency of the judicial branch of State government, but is funded separately from the Supreme Court of Appeals and is governed by a Board of Governors elected by members of the Bar.

[3]Then-Chief Justice Benjamin and Executive Director Casey are sued in their official capacities.

[4]In lieu of filing an answer addressing the merits of the allegations, respondents filed a motion to dismiss pursuant to Rule 12(b)(6) of the West Virginia Rules of Civil Procedure.

personal matters; ended the staff members' participation in a deferred compensation program; told the staff that other people "would kill" to have their lucrative jobs; and offered no assistance to either restore a quarterly report that was deliberately deleted from Ms. Blessing's office computer, or to determine how the deletion had occurred.

The Amended Complaint further alleges that much of Ms. Casey's criticism of both the State Bar and Ms. Blessing was related to Mr. Tinder, and that Ms. Casey's criticism was "aided and abetted" by certain current and former officers and members of the Board of Governors. According to the Amended Complaint, Ms. Casey and some Board of Governors' officials suspected that Mr. Tinder conducted improper financial activities during his tenure as Executive Director. According to Ms. Blessing, in a meeting with the State Bar's outside accountants, Ms. Casey accused her of being overpaid because she had "covered up" for Mr. Tinder. Ms. Blessing also asserts that incoming State Bar President Harry Deitzler sent e-mails that Ms. Blessing interpreted as making allegations that she had covered for criminal activity by Mr. Tinder. Ms. Blessing denies any cover-up and any improper or criminal acts, and asserts that staff salaries were always approved by the Board of Governors. In the Amended Complaint, Ms. Blessing alleges that then-Bar President Letitia Chafin expressed her intent to "bust" and "bury" Mr. Tinder. Ms. Blessing alleges that Ms. Chafin "was indebted to Ms. Casey, who had accompanied her on a state bar-financed tour of all of the state's courthouses that amounted to a thinly-disguised promotion of her later candidacy for the state supreme court."

In addition, the Amended Complaint alleges that Ms. Casey hired her friend Don Ryan to work as a technical expert, at a salary approximating Ms. Blessing's salary, and then relocated Ms. Blessing's office so that Mr. Ryan could constantly monitor and criticize her activities and conversations. Ms. Blessing states that Ms. Casey failed to take action against Mr. Ryan for his alleged misconduct that included falsifying his time records and performing work for his former employer on State Bar time.[5] Furthermore, Ms. Blessing alleges that during her last two weeks of employment, she discovered a tape recorder that Mr. Ryan hid in her office. She alleges that Ms. Casey and members of the Board of Governors learned of the tape recorder incident but allowed Mr. Ryan to retain his employment.[6]

The Amended Complaint alleges that Ms. Blessing had initially planned to take early retirement. However, following her husband's death in January of 2011, she changed her mind and decided to continue working at the State Bar. Ms. Blessing asserts that after communicating

---

[5]The judicial officers presiding over this case have no knowledge as to the truthfulness of any of the allegations of wrongdoing made in this case, including the allegations against Mr. Tinder and Mr. Ryan, and such matters are not before the Court for resolution.

[6]Ms. Blessing asserts that after she retired, she brought the tape recorder incident to the attention of the Supreme Court Clerk. She states that the Supreme Court arranged for an independent lawyer to investigate the incident, but she is not aware of the results of the investigation. She also reported the tape recorder incident to the Federal Bureau of Investigation, but she is similarly unaware of any action taken as a result of that complaint. She alleges that Mr. Ryan suddenly resigned shortly after she brought the tape recorder incident to the attention of the Supreme Court Clerk.

this decision, Ms. Casey's belittlement of her increased. Ms. Blessing claims that the circumstances at work caused her to experience constant anxiety and physical symptoms associated with anxiety, such as stomach disorders.

Ms. Blessing asserts that she and other employees complained about their treatment to several current and former members of the Board of Governors, as well as to the Supreme Court's Clerk and Deputy Clerk, but nothing changed. She asserts that the Supreme Court should be held liable for failing to intervene and stop the harassment perpetrated by Ms. Casey with the assistance of certain members of the Board of Governors. Regarding Justice Benjamin, the Amended Complaint alleges only that he was the Chief Justice at the time the Amended Complaint was filed, and that Ms. Blessing believes he and Ms. Casey are friends.

Ms. Blessing contends that in mid-February of 2011, she was unable to withstand the harassment any longer so she submitted her two-week notice to retire. Ms. Blessing asserts that Ms. Casey and certain high-ranking members of the Board of Governors did not attend her retirement luncheon, and, after her retirement, she had difficulty getting Ms. Casey to complete the paperwork necessary for her to receive retirement benefits.

In lieu of filing an Answer to the Amended Complaint, respondents filed a joint motion to dismiss pursuant to Rule 12(b)(6) of the Rules of Civil Procedure, which provides for dismissal when a complaint fails to state a claim upon which relief can be granted. After briefing by the parties and a hearing, the circuit court granted the motion to dismiss with prejudice by order entered on August 19, 2013.[7] This appeal followed.

## II. Standard of Review

"Appellate review of a circuit court's order granting a motion to dismiss a complaint is *de novo*." Syl. Pt. 2, *State ex rel. McGraw v. Scott Runyan Pontiac–Buick*, 194 W.Va. 770, 461 S.E.2d 516 (1995). As we noted above, for purposes of an appeal of a dismissal order, we treat the factual allegations in the complaint as true. Syl. Pt. 1, *Wiggins*, 178 W.Va. at 64, 357 S.E.2d at 746. Moreover, "[t]he trial court, in appraising the sufficiency of a complaint on a Rule 12(b)(6) motion, should not dismiss the complaint unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)." Syl. Pt. 3, *Chapman v. Kane Transfer Co., Inc.*, 160 W.Va. 530, 236 S.E.2d 207 (1977).

With these principles in mind, we turn to an examination of each count in the petitioner's Amended Complaint.

---

[7]Ms. Blessing does not assign as error the circuit court's "with prejudice" designation of the dismissal.

4

## III. Discussion

## A. Constructive Discharge

Count One of the Amended Complaint alleges, in its entirety, the following:

> As her first count in this action[,] plaintiff states the deliberate and malicious conduct toward her creating [sic] an intolerable working environment that was aided or abetted by others as set forth above[,] as well as tolerated and ignored by the state supreme court in its supervisory capacity[,] constituted a constructive discharge that forced her to resign.

Ms. Blessing attempts to plead constructive discharge as a distinct cause of action. We have held, however, that constructive discharge can only occur where an employer has created a hostile work environment based upon a protected status or other unlawful discrimination:

> A constructive discharge cause of action arises when the employee claims that because of age, race, sexual or other unlawful discrimination, the employer has created a hostile working climate which was so intolerable that the employee was forced to leave his or her employment.

Syl. Pt. 4, *Slack v. Kanawha Co. Housing & Redevelopment Auth.*, 188 W.Va. 144, 423 S.E.2d 547 (1992). Count One does not allege that Ms. Blessing was constructively discharged based upon her age, race, sex, or other unlawful discrimination. Accordingly, on its face, Count One of the Amended Complaint does not state a claim for which relief can be granted.

Even if we assume, for purposes of argument, that Count One was intended to be read *in pari materia* with other counts in the Amended Complaint, the dismissal of Count One was still appropriate. Counts Two and Three allege sex and age discrimination, respectively, while Count Four alleges that Ms. Blessing was forced to resign in violation of public policy. As we discuss below, these other counts do not state claims upon which relief can be granted. Because the other counts are not viable, they cannot form the basis for the constructive discharge claim.

In an attempt to salvage her constructive discharge claim, Ms. Blessing argues that the treatment she suffered at work is actionable even if it was not based upon her gender or age. She asserts that respondents discriminated against her "because she had been the previous executive director's top assistant and they were hell-bent not only to discredit him and but [sic] to have him prosecuted as well. As Blessing remained with the state bar, she received the brunt of this zealousness."

To be actionable, the alleged discrimination must be "unlawful." *Id.* For example, the unlawful discrimination at issue in *Slack* was retaliatory discharge based on legally-protected "whistleblowing" when an employee reported the illegal activities of her supervisor and employer to federal prosecutors. *Id.* at 147, 155, 423 S.E.2d at 550, 558; *see Harless v. First*

*Nat'l Bank of Fairmont*, 162 W.Va. 116, 246 S.E.2d 270 (1978).[8] Ms. Blessing's Amended Complaint is devoid of any factual assertion that she engaged in whistleblowing or other activity protected by law or state public policy. Simply being associated with a former supervisor does not provide an at-will employee with protection under *Harless*. While Ms. Casey's alleged treatment of Ms. Blessing, if true, may have been insensitive, Ms. Blessing has not alleged facts that would constitute unlawful treatment.

It is undisputed that Ms. Blessing was an at-will employee. If we were to accept Ms. Blessing's argument that she does not need to establish protected class or other unlawful discrimination in order to prevail on a discharge claim, we would be changing the very nature of at-will employment law in West Virginia.

Accordingly, we conclude that Count One was properly dismissed.

## B. Gender and Age Discrimination

Counts Two and Three, respectively, allege that the conduct described in the Amended Complaint amounted to sex and age discrimination against Ms. Blessing. We have held the following regarding a plaintiff's initial burden in an employment discrimination case:

> In order to make a prima facie case of employment discrimination under the West Virginia Human Rights Act, W.Va. Code § 5-11-1 *et seq.* (1979), the plaintiff must offer proof of the following:
>
> (1) That the plaintiff is a member of a protected class.
> (2) That the employer made an adverse decision concerning the plaintiff.
> (3) But for the plaintiff's protected status, the adverse decision would not have been made.

Syl. Pt. 3, *Conaway v. Eastern Associated Coal Corp.*, 178 W.Va. 164, 358 S.E.2d 423 (1986). We have also held that

> [i]n disparate treatment discrimination cases under the West Virginia Human Rights Act, W.Va. Code, 5-11-9 (1992), a plaintiff proves a claim for unlawful discrimination if he or she proves by a preponderance of the evidence that a forbidden intent was a motivating factor in an adverse employment action.

Syl. Pt. 6, in part, *Skaggs v. Elk Run Coal Co., Inc.*, 198 W.Va. 51, 479 S.E.2d 561 (1996).

---

[8]The syllabus of *Harless* provides: "The rule that an employer has an absolute right to discharge an at will employee must be tempered by the principle that where the employer's motivation for the discharge is to contravene some substantial public policy principle, then the employer may be liable to the employee for damages occasioned by this discharge." *Id.*, 162 W.Va. at 116, 246 S.E.2d at 271.

Some of the 100 paragraphs setting forth the factual allegations in the Amended Complaint mention that Ms. Blessing is female and was sixty-two years old at the time she took early retirement. Accordingly, she is a member of both the age and gender protected classes. For purposes of this discussion, we will accept as true that Ms. Blessing's employer made adverse decisions concerning her employment.

However, a review of the Amended Complaint reveals that Ms. Blessing has failed to allege any facts to establish the "but for" requirement of *Conaway* or the motivating factor requirement of *Skaggs*. Not one of those 100 paragraphs suggests that Ms. Blessing was mistreated because of her gender or age, or that the alleged mistreatment was in any way motivated by her gender or age. Rather, the claims in the Amended Complaint are based on the contention that Ms. Blessing was mistreated at work due to her association with former Executive Director Tinder and the operations of the State Bar during Mr. Tinder's tenure. At most, the Amended Complaint alleges "general harassment" that was not perpetrated on the basis of a protected status. We have held that "no general public policy against harassment in the workplace is created by the West Virginia Human Rights Act for purposes of West Virginia wrongful discharge law." *Travis v. Alcon Laboratories, Inc.*, 202 W.Va. 369, 383, 504 S.E.2d 419, 433 (1998); *see also, Johnson v. Killmer*, 219 W.Va. 320, 326, 633 S.E.2d 265, 271 (2006) (distinguishing office pettiness and politics from age-based harassment).

We note that the Amended Complaint does state that Ms. Casey hired a male employee, Mr. Ryan, who was paid almost as much as Ms. Blessing and more than other female employees. However, the Amended Complaint alleges that he was hired as a "technical expert," while Ms. Blessing worked as an "executive assistant." Accordingly, the Amended Complaint does not allege that they were similarly situated for purposes of salary comparison.

Accordingly, after a careful review of the Amended Complaint, we conclude that the sex and age discrimination counts were properly dismissed.[9]

### C. Violation of Public Policy

Count Four makes the following bald assertion:

The conduct described here that resulted in the plaintiff's forced resignation also constituted a violation of public policy by an organization established to govern

---

[9]Although not raised in respondents' motion to dismiss, it appears that the age and gender discrimination claims would also be time-barred. We held in Syllabus Point 3 of *Harmon v. Higgins*, 188 W.Va. 709, 426 S.E.2d 344 (1992), that "[i]n cases involving allegations of discharge from employment related to claims of sexual harassment or discrimination, a two-year statute of limitations for personal injuries begins to run on the date of the last offensive contact, or threat of offensive contact, which precipitated the termination of employment." Here, the allegedly harassing conduct that precipitated Ms. Blessing to terminate her employment occurred on or before mid-February 2011; mid-February is when she submitted her notice to retire. However, she did not file suit until February 26, 2013, more than two years later.

officers of the court while tolerated or sanctioned by the supervising entity responsible for administering justice in this state.

Importantly, the Amended Complaint fails to identify any source for the public policy that was allegedly violated in this case. Moreover, as discussed above, the Amended Complaint does not allege that Ms. Blessing engaged in any activity that would be protected by any public policy of this State, or that she was retaliated against by respondents because she engaged in a protected activity. Accordingly, on its face, the Amended Complaint fails to state a claim for constructive discharge in violation of a public policy.

Ms. Blessing argues that the public policy supporting her claim is in the State Bar's Constitution, which advocates for the advancement of the administration of justice and for upholding and elevating the standards of honesty, integrity, and courtesy in the legal profession. W.Va. State Bar Const., Art. II.

Beginning with *Harless*, we recognized that a successful claim for discharge in violation of public policy requires a showing that the employer's motivation for the discharge must have contravened a "substantial" public policy. Syl., *Harless*, 162 W.Va. at 116, 246 S.E.2d at 271. "Inherent in the term 'substantial public policy' is the concept that the policy will provide specific guidance to a reasonable person." Syl. Pt. 3, *Birthisel v. Tri–Cities Health Services Corp.*, 188 W.Va. 371, 424 S.E.2d 606 (1992). "To identify the sources of public policy for purposes of determining whether a retaliatory discharge has occurred, we look to established precepts in our constitution, legislative enactments, legislatively approved regulations, and judicial opinions." Syl. Pt. 2, *id.* "A determination of the existence of public policy in West Virginia is a question of law, rather than a question of fact for a jury." Syl. Pt. 1, *Cordle v. General Hugh Mercer Corp.*, 174 W.Va. 321, 325 S.E.2d 111 (1984).

The provision of the State Bar Constitution upon which Ms. Blessing now relies sets forth goals for the State Bar, specifically, to promote the administration of justice and high ideals in the practice of law. However, this provision has nothing to do with how the State Bar treats its employees, thus it does not provide guidance in this matter.

Accordingly, this count was properly dismissed.

### D. Invasion of Privacy

Count Five of the Amended Complaint alleges that "[t]he conduct described her[e] also amounted to an invasion of the plaintiff's privacy the plaintiff believes was sanctioned, if not encouraged, by defendant Casey and with the knowledge of all defendants which also amounted to a violation of the state bar's own personnel policy." The claim does not specify which of the alleged acts amounted to an invasion of privacy, but a careful reading of the Amended Complaint indicates that Ms. Blessing is referencing the deletion of the report from her office computer; Mr. Ryan's act of listening to her work telephone conversations; and the tape recorder she found in her office. The Amended Complaint alleges that those acts occurred during Ms. Blessing's employment. Indeed, any conceivable alleged act that could amount to an invasion of privacy would have occurred during Ms. Blessing's employment, which ended on February 28, 2011.

8

The initial Complaint in this lawsuit was not filed until February 26, 2013, more than two years after the last alleged act of invasion of privacy. However, invasion of privacy claims are subject to a one-year statute of limitations: "Invasion of privacy is a personal action that does not survive the death of the individual at common law or under W.Va. Code, 55-7-8a(a) (1959). Consequently, a claim for invasion of privacy is governed by the one-year statute of limitations provided by W.Va. Code, 55-2-12(c) (1959)." Syl. Pt. 1, *Slack*, 188 W.Va. at 145, 423 S.E.2d at 548. Therefore, because Ms. Blessing did not file her complaint within one year of the alleged invasion of privacy, her claim is time-barred.

We reject Ms. Blessing's assertion that the discovery rule applies. Under the discovery rule, a statute of limitations is tolled until a claimant knows or by reasonable diligence should know of her claim. Syl. Pt. 2, *Gaither v. City Hosp., Inc.*, 199 W.Va. 706, 487 S.E.2d 901 (1997). Syllabus Point 4 of *Gaither* provides,

> In tort actions, unless there is a clear statutory prohibition to its application, under the discovery rule the statute of limitations begins to run when the plaintiff knows, or by the exercise of reasonable diligence, should know (1) that the plaintiff has been injured, (2) the identity of the entity who owed the plaintiff a duty to act with due care, and who may have engaged in conduct that breached that duty, and (3) that the conduct of that entity has a causal relation to the injury.

The facts set forth in the Amended Complaint show that prior to the end of her employment, Ms. Blessing knew everything she needed to timely bring an invasion of privacy claim. She knew who allegedly breached her privacy, how and when this was done, and she believed that the conduct had a causal relation to her claimed injury. Although she states that she has never learned the true purpose for the tape recorder or whether its placement constituted a criminal act, such knowledge is not a prerequisite for bringing a civil suit for invasion of privacy. Therefore, the discovery rule does not apply.

### E. Intentional Infliction of Emotional Distress

The sixth and final count in the Amended Complaint alleges that "[t]he conduct described here constituted an intentional infliction of emotional distress that also harmed the plaintiff physically."

Intentional infliction of emotional distress, also known as the tort of outrage, requires proof that, *inter alia*, "the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency" resulting in "emotional distress suffered by the plaintiff . . . so severe that no reasonable person could be expected to endure it." Syl. Pt. 3, in part, *Travis*, 202 W.Va. at 371, 504 S.E.2d at 421.[10] "Whether conduct may reasonably be

---

[10]In its entirety, Syllabus Point 3 of *Travis*, 202 W.Va. at 371, 504 S.E.2d at 421, provides as follows:

9

considered outrageous is a legal question, and whether conduct is in fact outrageous is a question for jury determination." Syl. Pt. 4, in part, *id.*

There is a two-year statute of limitations for bringing suit on outrage claims. Syl. Pt. 7, *id.*; Syl. Pt. 5, *Courtney v. Courtney*, 190 W.Va. 126, 437 S.E.2d 436 (1993). As to the issue of when this limitations period begins to run, we have held that,

> [i]n claims for intentionally or recklessly inflicted emotional distress that arise from the termination of employment, the two-year statute of limitation for personal injuries begins to run on the date of the last extreme and outrageous conduct, or threat of extreme and outrageous conduct, which precipitated the termination of employment.

Syl. Pt. 8, *Travis*, 202 W.Va. at 371-72, 504 S.E.2d at 421-22. Thus, the limitations period begins to run on the date of the last outrageous conduct or threat thereof that precipitated the termination of employment—not on the last date of employment.

When announcing syllabus point eight of *Travis*, we relied upon a similar statute of limitations question decided in *Harmon v. Higgins*, 188 W.Va. 709, 426 S.E.2d 344 (1992), a case where the plaintiff alleged sexual harassment and discrimination on the job. In *Harmon*, the plaintiff last had contact with her allegedly harassing supervisor on September 24, 1986, but did not terminate her employment until September 30, 1986. We held that the plaintiff's filing of her lawsuit on September 27, 1988, was outside of the two-year statute of limitations for sexual harassment discrimination because the last offensive contact or threat of offensive contact which precipitated the termination of her employment had occurred on September 24, 1986.

Ms. Blessing filed her initial Complaint on February 26, 2013. Examining the facts alleged in her Amended Complaint, and accepting all of the factual allegations as true, it is clear that all of the alleged conduct that could potentially be deemed outrageous occurred prior to mid-February of 2011, more than two years before she filed suit. Indeed, she asserts that the alleged harassment was the reason why, in mid-February of 2011, she submitted her notice to retire. The only allegation that Ms. Blessing makes regarding her last two weeks at work is the tape recorder incident. However, she does not allege that it occurred on or after February 26, 2011—and, even if she had so alleged, she avers that the tape recorder was placed by a co-worker, whom she did not name as a defendant, and not by one of the respondents herein.

---

In order for a plaintiff to prevail on a claim for intentional or reckless infliction of emotional distress, four elements must be established. It must be shown: (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

10

Furthermore, as to the conduct that allegedly occurred after Ms. Blessing retired, not only did it not precipitate the termination of her employment, it also cannot reasonably be considered as "outrageous" for purposes of the tort of intentional infliction of emotional distress. While it may have been hurtful to Ms. Blessing's feelings that Ms. Casey and high-ranking Board of Governor's members did not attend her retirement luncheon or terminate Mr. Ryan's employment, and it may have been inconvenient that Ms. Casey delayed signing the pension paperwork, these were not acts so "atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency." *See* Syl. Pt. 3, *Travis*. Moreover, Ms. Blessing acknowledges that an investigation was begun when, after her retirement, she brought the tape recorder incident to the attention of the Supreme Court Clerk. Undertaking an investigation into the tape recorder incident is presumably what Ms. Blessing wanted and thus could not constitute the tort of outrage.

Because the Amended Complaint is devoid of any alleged outrageous conduct occurring on or after February 26, 2011, Count Six was untimely filed on February 26, 2013,[11] and was properly dismissed.[12]

For the foregoing reasons, we affirm the circuit court's dismissal of Ms. Blessing's Amended Complaint.

Affirmed.

**ISSUED:** May 27, 2014

**CONCURRED IN BY:**

Acting Chief Justice Allen H. Loughry II
Judge John W. Hatcher Jr.
Judge James J. Rowe
Judge Phil Jordan
Judge Lawrance S. Miller Jr.

---

[11]Because this count was untimely filed, we need not address whether the pre-February 26, 2011, allegations could constitute conduct that may reasonably be considered as outrageous.

[12]In her final assignment of error on appeal, Ms. Blessing argues that the circuit court failed to abide by the correct standard for granting a motion to dismiss. We find no support for this argument. The circuit court's order shows that it understood and applied the applicable law for consideration of Rule 12(b)(6) motions, including accepting the factual allegations as true.

Lastly, we note that the only allegations against the Supreme Court and then-Chief Justice Benjamin are that Supreme Court officials failed to intervene and stop the harassment allegedly perpetrated by Ms. Casey with the assistance of certain members of the Board of Governors. Because we have already determined that each count in Ms. Blessing's Amended Complaint was properly dismissed pursuant to Rule 12(b)(6), we do not address the issue of whether the Supreme Court had any duty to impose itself into this situation.

11

**VOLUNTARILY DISQUALIFIED:**

Chief Justice Robin Jean Davis
Justice Brent D. Benjamin
Justice Margaret L. Workman
Justice Menis E. Ketchum